COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Bumgardner and Kelsey
Argued at Alexandria, Virginia


LABOR FINDERS OF VIRGINIA, INC. AND
  AMERICAN CASUALTY COMPANY

                                              MEMORANDUM OPINION[*] BY
v.      Record No. 0295-04-4                  JUDGE JAMES W. BENTON, JR.
                                                    FEBRUARY 8, 2005
MARIO BALDIVIESO


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Joshua M. Wulf (Semmes, Bowen & Semmes, on briefs), for
        appellants.

        Daniel P. Barrera (Chandler, Franklin & O'Bryan, on brief), for
        appellee.


        Labor Finders of Virginia, Inc. and its insurer contend the Workers' Compensation

Commission erred in ruling that Mario Baldivieso's injury arose out of his employment. We

disagree and affirm the award.

                                              I.

        On appeal from the commission's decision, we view the evidence in the light most

favorable to Mario Baldivieso, who prevailed before the commission. Clinchfield Coal Co. v.

Reed, 40 Va. App. 69, 72, 577 S.E.2d 538, 539 (2003). So viewed, the evidence proved Waste

Management contacted Labor Finders on June 25, 2002 and arranged for the services of

Baldivieso as a temporary laborer on one of its trash collection trucks in Leesburg, Virginia.

When Waste Management's operations manager drove Baldivieso and other temporary workers

to trucks at 7:45 a.m. to begin the day's work, Baldivieso was wearing several shirts, which were

_____
[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

described as a tee shirt underneath a long-sleeved, light flannel shirt. Using a bilingual worker to translate into Spanish, the manager urged Baldivieso and the other temporary workers to be wary of the potential danger of the heat. Waste Management supplied a loose fitting, nylon safety vest for Baldivieso to wear during his work.

At 8:30 a.m., Baldivieso began working on a truck driven by Kiki Gouveia. Baldivieso's duties consisted of lifting trash cans and dumping the trash in the rear of the truck. As the truck traversed a route that included 750 residential homes and commercial sites, Baldivieso stood on the back step of the garbage truck, where there was no shade. For each unit, the trash ranges from one bag to three or four cans. Gouveia testified that the trash bags weighed an average of 15 to 20 pounds; the managers testified that the trash bins weighed an average of 35 to 100 pounds.

Gouveia testified that when Baldivieso arrived, he had already completed part of the route and had about 600 sites remaining. He also testified that he would get out of the truck to help Baldivieso about 95% of the time and said he completed much of the "heavier lifting" himself. The manager estimated that because the driver and his helper customarily work together, Baldivieso lifted 60 or 70% of the bags. Gouveia described Baldivieso as a "slow, steady worker."

The weather was extremely hot and humid that day. The U.S. Department of Commerce recorded that the temperature reached a high of 93 degrees at Dulles Airport with extremely high levels of humidity. The manager's report indicates the temperature reached 99 degrees in the area and was very humid.

At 11:00 a.m., Baldivieso joined Gouveia inside the truck while Gouveia drove to the unloading station. Gouveia did not use the air conditioning inside the truck during this drive or at anytime that day because it usually caused his truck to overheat. After unloading the truck,

Gouveia stopped to replenish the truck's five gallon water cooler, which was empty, and then resumed work between 12:00 and 12:30 p.m. They did not stop for a formal lunch break because Gouveia tried to complete the route as quickly as possible. Gouveia testified that he hustled and "pushed to get [his] route completed" because his pay is the same regardless of the time he expends. Baldivieso did not eat anything during the day.

Gouveia testified that they took several breaks to drink water throughout the day from the cooler mounted on the front of the truck. Although Waste Management provided Gatorade powder to aid hydration, Gouveia did not use it and preferred to fill the truck's cooler with ice and water. Gouveia testified that Baldivieso was "drinking like a fish."

At 4:30 p.m., with approximately 20 minutes of work remaining, Gouveia noticed that Baldivieso appeared to be having some difficulty. While he was sitting in the truck, Gouveia observed that Baldivieso was "having some problems" at the rear of the truck. When Gouveia approached Baldivieso, he appeared "disoriented," was slurring his speech, and was shaking. Gouveia testified that he did not have any earlier indication that Baldivieso was ill; however, due to the language barrier they communicated essentially by gesturing.

Gouveia called to request an ambulance to transport Baldivieso to a hospital. The hospital report indicates that Baldivieso's temperature was 109 degrees and that he had suffered "probable heat stroke." Baldivieso also had acute renal failure upon admission. Dr. Rosenthal later diagnosed probable brain damage. Dr. Page Fletcher diagnosed Baldivieso as having "post-traumatic dementia secondary to heat stroke." Baldivieso has been confined to a nursing home since his release from the hospital.

The deputy commissioner found that Baldivieso performed medium to heavy labor throughout the day in hot and humid conditions. He also ruled that Baldivieso suffered a heat stroke as a result of this work activity. Relying on Imperial Trash Service v. Dotson, 18

- 3 -

Va. App. 600, 445 S.E.2d 716 (1994), the deputy commissioner ruled that the evidence proved Baldivieso suffered an injury by accident arising out of and in the course of his employment. Thus, the deputy commissioner entered an award for temporary total disability and medical benefits. On review, the commission adopted the deputy commissioner's summary of the evidence and rejected Labor Finders' argument that the evidence failed to show extraordinary environmental conditions or work conditions distinguishable from other outdoor workers.

This appeal followed.

II.

Determining whether an injury arose out of employment is a mixed question of law and fact. Norfolk Community Hospital v. Smith, 33 Va. App. 1, 4, 531 S.E.2d 576, 578 (2000). On appeal, we review questions of mixed law and fact *de novo*. Caplan v. Bogard, 264 Va. 219, 225, 563 S.E.2d 719, 722 (2002); Fairfax County School Board v. Rose, 29 Va. App. 32, 37, 509 S.E.2d 525, 527 (1999).

To receive compensation for injuries, an employee must establish by preponderance of the evidence that he suffered an injury by accident "arising out of and in the course of [his] employment." Code § 65.2-101. To prove an injury arose out of the employment, the evidence must establish that the "conditions of the workplace . . . caused the injury." Plumb Rite Plumbing Serv. v. Barbour, 8 Va. App. 482, 483, 382 S.E.2d 305, 306 (1989). In making this determination, we employ the "actual risk test" to determine whether the employer exposed the employee to "the particular danger causing the injury, notwithstanding the public's exposure generally to similar risks." Kjellstrom v. Saunders, 42 Va. App. 673, 678, 594 S.E.2d 281, 283 (2004).

> [The] "actual risk test," mean[s] that the employment must expose
> the employee to the particular danger causing the injury,
> notwithstanding the public's exposure generally to similar risks.
> Thus, if there is a causal connection between [the employee's]

- 4 -

injury and the conditions of her employment, then her injury arose
out of her employment.

Combs v. Virginia Power, 259 Va. 503, 510, 525 S.E.2d 278, 282 (2000) (citation omitted).

The principle is well established that compensation may be granted to an employee who suffered heat stroke as a result of exposure during working conditions. In Byrd v. Stonega Coke & Coal Co., 182 Va. 212, 28 S.E.2d 725 (1944), an employee collapsed while removing coke from a hot oven for more than ten hours. The Supreme Court affirmed the award of compensation, concluding that the employee's death "was the result of the conditions under which [he] was required to perform the duties of his employment." Id. at 221, 28 S.E.2d at 729. Noting that Byrd is the "leading heat stroke case," we applied its rationale in Kjellstrom, where the employee was working as a "traffic flagger" on asphalt in extremely hot and humid conditions. 42 Va. App. at 679, 594 S.E.2d at 283. The evidence proved the employee was unable to take a break and collapsed after working seven hours. Affirming the award of compensation, we noted that "the commission found his exposure to the sun was beyond the norm" since he worked "in the open, in the sun, on asphalt and concrete, with no relief afforded by [his] employer." Id. at 680, 594 S.E.2d at 284.

Labor Finders argues that Baldivieso's injury did not arise out of the employment because the evidence is insufficient to support a finding of extraordinary working conditions. In Dotson, we addressed a factual circumstance almost identical to this case, where the employer similarly argued that "the nature of [the employee's] duties did not place him at greater risk for heatstroke beyond that to which the public is normally exposed." 18 Va. App. at 603, 445 S.E.2d at 718. There, we held the record supported the commission's finding, including the following:

> The commission found that Dotson's employment exposed him
> to hazards over and above those to which the public is exposed.
> The commission noted that "the public at large was not working

within the confines of a [non-air-conditioned] truck, repeatedly getting into and out of a truck, nor emptying from 350 to 400 containers into [it] . . . .  This work was performed in temperatures which had reached almost 90 degrees at the time Dotson collapsed. In addition, the humidity had reached approximately 57 percent."

The commission could find, as it did, that the combination of the heat, the humidity, the physical exertion, and working in the non-air-conditioned truck caused Dotson to become dehydrated and to suffer a heatstroke.

Id. at 604-05, 445 S.E.2d at 719.  As the Supreme Court has often repeated, an injury "arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury."  Combs, 259 Va. at 509, 525 S.E.2d at 282 (citation omitted); accord United Parcel Serv. of Am. v. Fetterman, 230 Va. 257, 258, 336 S.E.2d 892, 893 (1985); Bradshaw v. Aronovitch, 170 Va. 329, 335, 196 S.E. 684, 686 (1938).

In this case, the commission found that Baldivieso suffered a heatstroke under similar conditions as Dotson and that it was caused by the working conditions.  In particular, the commission made the following findings:

[Baldivieso] worked a long day on June 25, 2002, in temperatures that were very hot.  The weather records from Dulles International Airport showed a high of 93 degrees, and the witness testimony showed that the temperatures and humidity on the claimant's route made the weather "very stuffy and hot" and "extremely hot."  [Baldivieso] spent most of the day walking alongside the truck, picking up trash bags, or riding on the back of the truck between pickups.  It is not speculative to conclude that the roadways used for the route were not shaded.  As for the site of the accident, the evidence showed that it was a new development that was "wide open" and without tree cover.  Finally, and importantly, [Baldivieso's] temperature at the scene was noted to be 109 degrees, which obviously is not a condition commonly experienced by other outdoor workers.

. . . In conclusion, the evidence was clear that [Baldivieso] suffered a heat stroke on June 25, 2002, as a result of his employment.  The injury was the result of working outside on a very hot day in summer, when the majority of his time was spent

- 6 -

either walking alongside a trash truck, picking up and throwing trash into the truck, or riding on the back of the truck. Unlike other workers, he was not protected from the elements, and at the time of the accident, his body temperature was 109 degrees. Finally, Dr. Rosenthal noted on September 13, 2002, that the heat stroke was caused by his work and there was no reason for his heat stroke other than his work.

We hold that this credible evidence in the record supports the commission's findings that Baldivieso's injury by accident arose out of his employment. Accordingly, we affirm the commission's award.

<u>Affirmed.</u>